UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KEITH M. WILKINS,

           Petitioner,

      v.

JEFF LYNCH, Acting Warden,

           Respondent.

Case No.  19-cv-06119-YGR (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; AND DENYING CERTIFICATE OF APPEALABILITY**

## I.  INTRODUCTION

Petitioner Keith M. Wilkins brings this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his state court conviction.  Dkt. 1.  Specifically, on December 22, 2015, a San Francisco County jury found Petitioner guilty of voluntary manslaughter, second degree murder, and multiple counts of firearm-possession.  The victims, Frederick Glaspie and Marche Daniels, were shot and killed on July 30, 3012 in San Francisco, California.  Petitioner was convicted of both murders.

Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES the petition as to all claims for the reasons set forth below.

## II.  BACKGROUND

### A.  Factual Background

The state appellate court handled the direct appeal filed by Petitioner in an unpublished opinion and described the relevant facts as follows[1]:

> At trial, the prosecution played a surveillance video which showed on the afternoon of July 30, 2012, appellant shot Glaspie in the head. Daniels witnessed the shooting and began to run away, but appellant shot him in the head from behind.  Appellant then stood over Daniels and shot him twice more in the head.  He returned to Glaspie and shot him again in the head.
>
> Glaspie had no weapon on him and none were found near his body. Daniels also had no weapon on him and there were no weapons on

---

[1] This summary is presumed correct.  *See Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

the ground near him.

Appellant's friend, Elijah Hopkins, had been killed two days before and appellant believed Daniels was involved in his murder. On July 30, 2012 some of Hopkins's family and friends, including appellant, were gathered at his home on Burr Street (the Burr Street house) in San Francisco.

Janeka Fells was visiting the Burr Street house to check on her friend Erica Augusta, Hopkin's sister. She saw Daniels and Glaspie arrive at the house and go upstairs and then she heard yelling. Everyone went outside and she saw that Daniels was crying and his lip was bleeding. She saw appellant talking with Glaspie. Daniels repeatedly told Fells: "I didn't do it." Fells never saw Daniels or Glaspie with a weapon or heard them threaten anyone.

Erica Augusta testified that when Daniels and Glaspie arrived at her house she felt scared because there had been talk that Daniels killed her brother.

Augusta identified appellant as the shooter in the video. Fells and Augusta both testified that appellant had a reputation as a peacemaker and a nonviolent person.

After the shooting, appellant fled the scene. Approximately three weeks later, officers attempted to arrest appellant and he ran from the officers after discarding a semiautomatic handgun.

Appellant testified at trial and admitted he shot both Daniels and Glaspie. He stated that he shot them because he was "afraid for his life and the lives of others in the house that they were going to kill somebody. Or hurt somebody." He stated that Towerside gang members had "shot up the house" before in 2009 and he believed Daniels was going to start fighting. Appellant stated he had been threatened multiple times in the past by Glaspie. When he was 17 years old, Glaspie threatened him with a gun. Appellant believed Glaspie wanted to start a gang war and was unconcerned about killing innocent people.

Appellant testified that Glaspie was a "general" in the Towerside gang. He acted as a mediator for the Towerside and Sunnydale gangs. Appellant believed that Daniels was Glaspie's "flunkey" who did Glaspie's "dirty work." Appellant stated that Glaspie told him that if you messed with him, he would kill "whoever was close to you."

Appellant testified that on the day of shooting, he felt "panic" when he saw Daniels and Glaspie arrive at the Burr Street house. He said two of the people in the house had guns. He took a gun from one of them. He said he just wanted to prevent any violence from happening.

When Daniels and Glaspie arrived at the front porch, appellant confronted them. Daniels stated: "I didn't do it." Appellant testified that he told Daniels, "Get the fuck out of here" and "you did it." Daniels entered the house. Appellant blocked Glaspie from entering the house. Glaspie stated: "It's about time you feel what I feel," which appellant took to mean the loss of a friend. After a commotion in the

house, Glaspie pushed past appellant to go inside.  Appellant walked out to the sidewalk with a gun under his arm.  Appellant was afraid Daniels and Glaspie had other friends or gang members coming to back them up.

When Glaspie and Daniels returned to the front of the house, appellant pulled out the gun and told them to leave.  Appellant stated he did not want to shoot Glaspie but he needed him to leave because he did not want a war between the gangs.  Everyone was arguing and appellant believed Glaspie and Daniels were lying.  He described himself as "[a]ngry, frightened, scared, hurt, nervous, paranoid, sad."

At this point, appellant claims Glaspie said: "I'm going to get my Tower niggas."  He started shooting because he was "scared" that Glaspie was going to hurt someone in the house.  "I'm like, fuck, you're not going to hurt me or nobody else."

On cross-examination, appellant admitted that he did not think Daniels was armed.

*See People v. Wilkins,* No. A148607, 2018 WL 4091012, *1-2 (Cal. App. 1 Dist. Aug. 28, 2018).

**B.    Procedural History**

**1.    Conviction and Sentencing**

Petitioner was charged with two counts of premeditated first degree murder (Cal. Penal Code § 187(a)) for the murders of Glaspie (count one) and Daniels (count two).  The information alleged personal discharge of a firearm (Cal. Penal Code § 12022.53(d)) and the special circumstance of multiple murders (Cal. Penal Code § 190.2(a)(3)).  Additionally, Petitioner was charged with one count of being a felon in possession of a firearm (Cal. Penal Code § 25400(a)(2)), and one count of being a convicted person carrying a loaded firearm (Cal. Penal Code § 25850(a)).

A San Francisco County jury acquitted Petitioner of the first degree murder counts but found him guilty of the lesser-included offenses of voluntary manslaughter for count one (Glaspie) and second degree murder for count two (Daniels).  The jury found true the firearm-discharge allegations and found Petitioner guilty of all remaining counts.  The trial court sentenced Petitioner to forty years to life, plus twenty-one years.  5 Clerk Transcript ("CT") 1134-1140.

**2.    Post-Conviction Appeals and Collateral Attack**

Petitioner appealed the judgment and argued that his second degree murder conviction should be reversed.  5 CT 1136.  On August 28, 2018, the California Court of Appeal disagreed

3

and affirmed Petitioner's judgment.  Resp't Ex. A; *Wilkins*, 2018 WL 4091012, *10.  On

December 12, 2018, the California Supreme Court denied the petition for review.  Resp't Ex. B.

### 3.    Federal Court Proceedings

On September 26, 2019, Petitioner filed the instant federal habeas petition.[2]  Dkt. 1.  The

Court points out that Petitioner is only challenging his second degree murder conviction as to the

killing of Daniels, just as he did on direct appeal.  *See id.* at 10, 34; *see also Wilkins*, 2018 WL

4091012, at *1.  He raises three claims: (1) the trial court improperly excluded expert testimony

that was necessary to his defense; (2) the prosecutor committed misconduct[3] during the rebuttal

argument by misstating the standard for heat of passion voluntary manslaughter; and

(3) cumulative error.  Dkt. 1 at 8-37.[4]  On October 29, 2019, the case was reassigned from

Magistrate Judge Joseph C. Spero to the undersigned.  Dkt. 6.  On December 27, 2019, the Court

issued an order to show cause.  Dkt. 9.  On February 24, 2020, Respondent filed an answer.  Dkt.

12, 12-1.  Petitioner then filed a traverse on July 13, 2020.[5]  Dkt. 15.  This matter is fully briefed

and ripe for adjudication.

## III.    LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground

that he is in custody in violation of the Constitution or laws or treaties of the United States."  28

U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996,

a district court may not grant a petition challenging a state conviction or sentence on the basis of a

claim that was reviewed on the merits in state court unless the state court's adjudication of the

---

[2] The Court notes that Petitioner completed the Court's federal habeas corpus form, but instead of outlining his claims he has attached a copy of his petition for review, which was filed in California Supreme Court.  *See* Dkt. 1 at 7-37.

[3] Petitioner describes this claim as "prosecutorial *misstatement*" but discusses legal theories relating to prosecutorial *misconduct*.  Dkt. 1 at 27-34.  Thus, the Court refers to Petitioner's second claim as a prosecutorial misconduct claim.

[4] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by the parties.

[5] The Court notes that in lieu of drafting a traverse, Petitioner has once again attached a copy of his petition for review.  *See* Dkt. 15 at 2-27.

United States District Court
Northern District of California

claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, s*ee Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of section 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of section 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under the second prong, *see* 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; *Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt."

1   *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted).  Even if constitutional

2   error is established, habeas relief is warranted only if the error had a "substantial and injurious

3   effect or influence in determining the jury's verdict."  *Penry v. Johnson*, 532 U.S. 782, 795-96

4   (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

5          In applying the above standards on habeas review, the courts in this Circuit look to the

6   decision of the highest state court to address the merits of the petitioner's claims in a reasoned

7   decision.  *See Wilson v. Sellers*, __ U.S. __, 138 S. Ct. 1188, 1192 (2018); *LaJoie v. Thompson*,

8   217 F.3d 663, 669 n.7 (9th Cir. 2000).  When there is no reasoned opinion from the highest state

9   court to consider the petitioner's claims, the courts look to the last reasoned opinion.  *Ylst v.*

10  *Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th

11  Cir. 2000).  Thus, a federal court will "look through" the unexplained orders of the state courts

12  rejecting a petitioner's claims and analyze whether the last reasoned opinion of the state court

13  unreasonably applied Supreme Court precedent.  *See Ylst*, 501 U.S. at 804-06; *LaJoie*, 217 F.3d at

14  669 n.7.  The last reasoned decision in this case is the California Court of Appeal's unpublished

15  disposition issued on August 28, 2018, in which the state appellate court considered all of

16  Petitioner's claims.  *See Wilkins*, 2018 WL 4091012, at *1-10.

17  **IV.     DISCUSSION**

18          **A.      Exclusion of Defense Gang-Expert Testimony**

19                  **1.      Background**

20          Petitioner claims that the trial court improperly excluded the proposed testimony of a

21  defense gang-expert witness, who would have discussed the victims' gang affiliation and the

22  character of the neighborhood.  Dkt. 1 at 9-25.  Just as Petitioner did on direct appeal, he only

23  raises this claim as to the second degree murder conviction for killing Daniels.  *Id.* at 10; *see also*

24  *Wilkins*, 2018 WL 4091012, at *1.  Specifically, Petitioner claims that he was deprived of a

25  meaningful opportunity to present a complete defense because had the jurors heard such testimony

26  "it is reasonably probable that at least one [juror] would have had a reasonable doubt that

27  Daniel[s]'s death did not result from imperfect self-defense or heat-of-passion manslaughter."

28  Dkt. 1 at 10.

### 2.    State Court Opinion

The state appellate court summarized the proposed testimony and relevant trial court proceedings as follows:

> Prior to trial, appellant filed an "Offer of Proof Re: Witness Tim O'Brien." O'Brien is a private investigator who had 20 years' experience investigating crimes in the Sunnydale and Visitation Valley area of San Francisco. The Offer of Proof included O'Brien's views of the victims, Fred Glaspie and Marche Daniels. Glaspie was a "senior member" of the Towerside gang and Daniels was a member. It also included his views on appellant who he was told by other officers was not a gang member.

> The prosecution filed a motion in limine to exclude or limit the presentation of gang evidence. There were no gang allegations in the information and any gang evidence was irrelevant. They argued appellant could not properly present evidence of a victim's character pursuant to Evidence Code section 1103 through O'Brien's hearsay testimony. The testimony was not relevant to self-defense because the standard is a reasonable person not a reasonable gang member or reasonable person in a tough neighborhood. The introduction of evidence of the victims' gang association was not relevant, was prejudicial, and would consume an inordinate amount of time.

> In response, appellant proposed to call San Francisco Police Department Inspector Joshua Kumli to testify as a gang expert. Kumli would testify about a gang's impact on young black males in their territory, the gang's use of fear, violence and intimidation, and gang members proclivity for carrying firearms. Kumli would also assert that both victims were active gang members with reputations for dangerousness and violence. Appellant argued his state of mind was relevant to provocation and self-defense.

> The court held a hearing on the issue on July 15, 2015. The court stated that it could not see how the gang issue was relevant. There was "no self-defense" because the video showed the shooter going up to each of the victims as they are lying on the ground and shooting each of them a second time.

> Appellant argued it was a single course of conduct and only a matter of seconds between shots. The prosecution argued appellant's state of mind was something only he could testify to and no third party could explain what appellant felt or understood. It is an objective reasonable person standard, "not a reason[able] person from a particular neighborhood." In addition, the testimony was unduly prejudicial and time-consuming.

> The court stated that under Evidence Code section 352, the gang evidence "tends to mislead the jury and is an undue consumption of time." The court then stated that if appellant elected to testify and it opened the door, the court was not precluding him from raising the issue again.

> Appellant argued that the prosecution had misstated the standard: it is

7

a reasonable person in a similar neighborhood with similar knowledge. The court responded: "It's not a reasonable member of *that* community." (Italics added.) The court stated that it was allowing evidence that the community believed the victims had killed Elijah Hopkins.

The prosecution argued the evidence would demonstrate that appellant believed Daniels was responsible for Hopkins's death and that motivated the shooting. The evidence related to the personal relationship among these men, not a broad-based history of the neighborhood.

The court again stated that it had not heard from appellant yet and it would "leav[e] the door open" to raise the issue again if the prosecution raised something making it relevant. "At this point I think it's [Evidence Code section] 352. It's not probative. It is very prejudicial. It's also extremely time consuming . . . and it takes the jury on a completely different tangent from the facts before us."

At the close of the prosecution's case, defense counsel again asked that Inspector Kumli be allowed to testify about Glaspie's gang involvement. The prosecution argued that one of the officers testified that Glaspie was "friendly" but not about his reputation. This did not open the door to allow gang testimony. Whether Glaspie was a gang member was not a question before the jury requiring expert testimony. The court responded: "I agree. So that's not coming in."

*Wilkins*, 2018 WL 4091012, at *3-4.

The state appellate court rejected this claim upon finding no error in the trial court's exclusion of gang expert testimony, stating as follows:

Appellant argues that the court abused its discretion in refusing to admit the testimony of his gang expert. On appeal, appellant only raises this claim as to the second-degree murder conviction for killing Daniels. Appellant asserts preclusion of the testimony violated his Sixth and Fourteenth Amendment rights to present a defense.

"Self-defense, when based on a reasonable belief that killing is necessary to avert an imminent threat of death or great bodily injury, is a complete justification, and such a killing is not a crime. [Citations.] A killing committed when that belief is unreasonable is not justifiable. Nevertheless, 'one who holds an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury does not harbor malice and commits no greater offense than manslaughter.' [Citation.]" (*People v. Elmore* (2014) 59 Cal. 4th 121, 133-134, italics omitted.) " 'The subjective elements of self-defense and imperfect self-defense are identical. Under each theory, the [defendant] must actually believe in the need to defend . . . against imminent peril to life or great bodily injury.' [Citation.]" (*People v. Sotelo-Urena* (2016) 4 Cal. App. 5th 732, 744 (*Sotelo-Urena*).)

The trial court instructed the jury on self-defense that appellant must reasonably believe he or others present at the Burr Street house were

in imminent danger of being killed or suffering great bodily injury or reasonably believe the immediate use of deadly force was necessary. "When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed." The court further instructed the jury they could consider if appellant knew Glaspie and Daniels had threatened or harmed others in the past. The trial court also instructed the jury on heat of passion, provocation, and imperfect self-defense.

The trial court did not err in refusing to allow a gang expert to testify for several reasons. First, appellant failed to renew his motion to introduce expert testimony after he testified as he was advised to do by the court. At the original hearing, the court stated that the prosecution's theory of the case was that appellant killed both victims because he believed they killed Hopkins. The prosecution stated the shooting was personal, not related to the history of the neighborhood. Appellant argued it related to his experiences over the last four or five years and the prosecution was going to argue it is something he made up and his fears were not based in fact. The court responded: "Maybe. I haven't heard from Mr. Wilkins yet. Nobody has. That's why I'm leaving the door open. If it happens that you need to corroborate something from the District Attorney's Office, I'm going to revisit this issue, and you are welcome to bring it up again." The court specifically stated that it was not precluding appellant from talking about these issues but the expert testimony was not probative, it was prejudicial and "extremely time consuming."

Appellant's testimony raised the issue that the victims' gang membership created his fear. Appellant testified about his relationship with Glaspie and that Glaspie had threatened him [in] the past. He did not testify to any similar threats by Daniels. Appellant's testimony did not require corroboration by a gang expert. He explained the nature of the community, the fact he believed Glaspie and Daniels were Towerside gang members, and his thoughts and feelings prior to the shooting.

Appellant argues that we should apply the analysis in *Sotelo-Urena* where Division Two of this court reversed a first degree murder conviction because the trial court precluded expert testimony on homelessness relevant to the defendant's claim of self-defense. (*Sotelo-Urena*, *supra*, 4 Cal. App. 5th at pp. 736-737.) Sotelo-Urena, a homeless man, stabbed another homeless man. Sotelo-Urena claimed self-defense based on his belief he needed to use lethal force to defend himself from an attack. (*Id.* at p. 741.) Sotelo-Urena sought to have a former judge testify as an expert on homelessness in three areas: (1) empirical studies on the higher rate of violence against homeless people; (2) fear and victimization among the homeless; and (3) a greater than normal sensitivity to perceived threats of violence by homeless individuals. (*Id.* at pp. 741-742.) The trial court found that homelessness was within the common experience of the jurors and the issue was not the defendant's homelessness but being alone, at night behind the library. (*Id.* at p. 742.) The court precluded the expert testimony and Sotelo-Urena did not testify at trial, although his recorded statements were played for the jury. (*Id.* at pp. 737, 743.)

United States District Court
Northern District of California

Sotelo-Urena was homeless and had been stabbed a few weeks prior to the murder.  He believed that the victim had been involved in his stabbing and he had to stab the victim before the victim stabbed him. (*Sotelo-Urena*, *supra*, 4 Cal. App. 5th at p. 745.)  The expert "was prepared to testify that individuals who are chronically homeless, like defendant, are subjected to a high rate of violence by both housed and homeless individuals, and that the experience of living for years on the streets instills a perpetual fear of violence that would have affected defendant's belief in the need to defend himself with lethal force." (*Id.* at pp. 745-746.)  Division Two found this testimony was relevant because it would have helped the jury understand the situation from the defendant's perspective.  (*Id.* at p. 746.)  It explained his heightened sensitivity to aggression.  (*Ibid.*)  The court applied the same rationale as intimate partner battering where the victim spouse has a heightened sensitivity to danger.  (*Ibid.*)  "The same rationale applies here.  According to [the expert], a homeless individual who has repeatedly been subjected to violence and the threat of violence will experience a heightened sensitivity to such threats and will have a reduced threshold at which he or she subjectively perceives an imminent threat." (*Id.* at p. 747.)

In *People v. Humphrey* (1996) 13 Cal. 4th 1073 (*Humphrey*), our Supreme Court held that expert evidence on intimate partner violence was admissible under Evidence Code section 1107, but explained that its decision was not "changing the standard from objective to subjective, or replacing the reasonable 'person' standard with a reasonable 'battered woman' standard" for self-defense and that its decision "would not, in another context, compel adoption of a ' "reasonable gang member" standard.' " (*Humphrey*, at p. 1087.)

The Attorney General argues that *Sotelo-Urena* is distinguishable because *Sotelo-Urena* did not testify and no other trial evidence established the high rates of violence against homeless individuals.  Here, appellant's own testimony established the character of the neighborhood, the fact both victims were Towerside gang members, and that he feared an outbreak of gang violence at the gathering.  Prior to appellant's testimony, the court had concluded that the video of appellant's conduct showed no self-defense.  In the video, appellant shot both victims and then shot each of them again when they were lying on the ground.

Sotelo-Urena faced an imminent threat of violence from the other homeless man.  The man was on drugs, Sotelo-Urena believed he had a knife in his hand, and they began to "tangl[e]" with each other. (*Sotelo-Urena*, *supra*, 4 Cal. App. 5th at p. 738.)  Here the undisputed testimony is neither Glaspie nor Daniels were armed, both men were on the street in front of the house and neither of them posed an imminent threat of violence or injury to appellant.  Daniels was walking away when he was shot in the back of the head.  Appellant testified that he knew neither man was armed so, at most, his fear was that other members of the Towerside gang might arrive and cause him or other[s] harm.  As explained below, this is insufficient to support an imperfect self-defense claim.

In *Sotelo-Urena*, Division Two stressed that precluding the expert

10

meant no information about the violence against and among homeless individuals was before the jury. The expert's testimony would have allowed the jury to hear [and] understand the perspective of a chronically homeless man who had been recently assaulted. (*Sotelo-Urena*, *supra*, 4 Cal. App. 5th at p. 745.) Here, there was evidence before the jury about the character of the neighborhood and appellant's previous exposure to gang violence. Additionally, appellant testified about his own fear and feelings at the time of the shooting. Finally, the experience of living in a high-crime neighborhood or area with gangs is not beyond the jury's common experience. A multitude of cases provide that expert testimony about the psychology and culture of street gangs is admissible to explain the actions of gang members (*People v. Gonzalez* (2006) 38 Cal. 4th 932, 944), but appellant repeatedly stressed he was not a gang member. Unlike the chronically homeless man in *Sotelo-Urena* or the abused spouse in *Humphrey*, there was no basis to admit expert testimony that appellant had a heightened sensitivity to threats of violence. Appellant and other witnesses described him as a peacemaker or mediator in the community demonstrating an ability to control his emotions and calm others.

In a recent decision, the Fourth District sought to clarify the reasonable person standard applicable to self-defense. (*People v. Brady* (2018) 22 Cal. App. 5th 1008 (*Brady*).) *Brady* involved a self-defense claim by a homeless individual with bipolar disorder, posttraumatic stress disorder, and a history of being a victim of violence. (*Id.* at pp. 1010-1011.) He argued that the standard is what would someone with his attributes do when faced with an imminent threat. The court held this was not the standard. "To justify an act based on self-defense, a defendant must have subjectively held an objectively reasonable belief that bodily injury was imminent. The objective component considers what would have appeared necessary to a reasonable person in the defendant's situation with his or her knowledge." (*Id.* at p. 1010.) The *Brady* court recognized *Sotelo-Urena* concluded that expert testimony regarding chronic homelessness was relevant to the objective prong of a self-defense claim. (*Id.* at p. 1016.) But *Sotelo-Urena* did not create a "'reasonable homeless person standard.'" (*Ibid.*) *Brady* interpreted the court's holding in *Sotelo-Urena* as "expert testimony regarding chronic homelessness could bear on the issue of reasonableness by showing that, due to the greater incidence of violence toward homeless persons, 'a [homeless individual] might become sensitized and thus able reasonably to discern when danger is real and when it is not.'" (*Ibid.*, quoting *Humphrey*, supra, 13 Cal. 4th at p. 1086.)

The Brady court concluded: "Simply put, we view *Humphrey* and *Sotelo-Urena* as providing that the reasonable person standard takes into account a defendant's knowledge that may increase his or her ability to accurately predict impending violence. [Citation.]" (*Brady*, *supra*, 22 Cal. App. 5th at p. 1017, italics omitted.) The court held this did not include Brady's personal attributes or experiences. His personal history of trauma was not folded into the objective prong of a self-defense claim. (*Ibid.*)

Similarly, here, appellant's personal experience with Glaspie and the Towerside gang was presented to the jury but it [is] not part of the

reasonable person standard and does not require expert testimony.

The expert testimony appellant sought to introduce was not probative and was prejudicial. The offer of proof included O'Brien's views of the gang culture in Visitation Valley, the victims' gang affiliation and the city attorney's gang injunction against the Towerside gang. It also included O'Brien's opinions about the victims, much of which was inadmissible hearsay.

After appellant testified, his testimony combined with Augusta and Fells explained the relationship between the Towerside gang and individuals present at the Burr Street house. Appellant also explained his experience with the victims and the fact he was threatened when he was younger. The jury had the necessary " ' " 'facts and circumstances' " ' " to determine whether a reasonable person in a similar situation with similar knowledge would feel the need to defend himself. (*Humphrey*, *supra*, 13 Cal. 4th at pp. 1082-1083.) We find no error in the court's exclusion of gang expert testimony.

*Id.* at *4-8 (brackets added).

The state appellate court further found that even if the trial court erred in excluding the gang expert's testimony, Petitioner was not prejudiced, stating as follows:

Even if the trial court erred in excluding the gang testimony, any such error was not prejudicial. Appellant argues that we must apply the harmless beyond a reasonable doubt standard under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), but " 'the routine application of provisions of the state Evidence Code law does not implicate a criminal defendant's constitutional rights.' (*People v. Jones* (2013) 57 Cal. 4th 899, 957; accord *People v. Robinson* (2005) 37 Cal. 4th 592, 626-627 [' "[A]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [state or federal constitutional] right to present a defense." '].) . . . [T]he trial court's error was one of state evidentiary law only, and the proper standard of review is whether it is reasonably probable that defendant would have obtained a more favorable result in the absence of the error. [Citations.]" (*Sotelo-Urena*, *supra*, 4 Cal. App. 5th at p. 756.) We therefore consider whether it is reasonably probable that appellant would have obtained a more favorable verdict if the testimony was admitted under *People v. Watson* (1956) 46 Cal. 2d 818, 836.

Given the evidence at trial, it is not reasonably probable that appellant would have obtained a more favorable result if a gang expert was allowed to testify. As the trial court noted, the videotape played for the jury showed appellant shoot Glaspie in the head. Daniels witnessed the shooting and began to run away and appellant shot him in the head from behind. Appellant then stood over Daniels and shot him twice more in the head. He then returned to Glaspie and shot him again in the head. Both victims were not armed.

Prior to the shooting, Daniels was crying and repeatedly saying "I didn't do it." Janeka Fells testified she never saw Daniels or Glaspie with a weapon or heard them threaten anyone. Appellant testified Glaspie said: "I'm going to get my Tower niggas," but he never

mentioned any threat by Daniels. Appellant perceived Glaspie's statement as a threat, but even if we accept the statement as true, it was not an imminent threat. Self-defense "requires without exception that the defendant must have had an actual belief in the need for self-defense. . . . Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of imminent danger to life or great bodily injury." (*In re Christian S.* (1994) 7 Cal. 4th 768, 783, italics omitted.) Appellant failed to demonstrate imminent danger, especially from Daniels. Glaspie and Daniels were standing on the street, unarmed. Even if we believe appellant's testimony that he thought Glaspie may have summoned or would summon members of his gang, that was not an immediate threat to appellant's life or body.

The gang expert testimony was supposed to demonstrate Glaspie was a Towerside gang leader, Daniels was associated with Towerside gang members and that their presence at the Burr Street house was a provocative act. However, all of this was presented to [the] jury through testimony of other witnesses as well as appellant's testimony.

Finally, appellant testified the [sic] he felt scared and wanted to prevent gang violence which caused him to shoot Glaspie and Daniels. However, shooting two gang members, one of whom appellant believed to be a leader, would only incite more violence and retribution. Appellant failed to testify to anything that made the gang expert testimony more probative than prejudicial.

The trial court did not err in finding the proposed expert testimony was more prejudicial than probative because it was not relevant to the issues before the jury.

*Id.* at *7-8.

### 3.    Applicable Federal Law

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing on a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *See Pulley v. Harri*s, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991). Furthermore, a violation of a state procedural law does not give rise to a cognizable claim on federal habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("'federal habeas corpus relief does not lie for errors of state law.'") (citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). It is well established that "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). However, this right is not absolute. There is no requirement "that a defendant must be allowed to put on any evidence he chooses."

United States District Court
Northern District of California

*LaGrand v. Stewart*, 133 F.3d 1253, 1266 (9th Cir. 1998).  States have "broad latitude" to establish rules excluding evidence from criminal trials so long as the rules "are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'"  *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (citations omitted).

State and federal rule makers have broad discretion in excluding evidence from trials. *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); *see also Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (holding due process does not guarantee a defendant the right to present all relevant evidence.  This discretion is limited by a defendant's constitutional rights to due process and "a meaningful opportunity to present a complete defense."  *Holmes*, 547 U.S. at 324 (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)).  Despite this, "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury."  *Holmes*, 547 U.S. at 326; *see Egelhoff*, 518 U.S. at 43 (exclusion of evidence does not violate Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental").

Furthermore, there is little guidance on how to evaluate claims regarding discretionary exclusion of expert testimony or any other particular piece of evidence:

> [T]he Supreme Court's cases have focused only on whether an evidentiary rule, by its own terms, violated a defendant's right to present evidence.  These cases do not squarely address whether a court's exercise of discretion to exclude expert testimony violates a criminal defendant's constitutional right to present relevant evidence.  Nor do they clearly establish 'a controlling legal standard' for evaluating discretionary decisions to exclude the kind of evidence at issue here.

*Brown v. Horell*, 644 F.3d 969, 983 (9th Cir. 2011) (quoting *Moses v. Payne*, 555 F.3d 742, 758-59 (9th Cir. 2009)).

Finally, a violation of the constitutional right to a meaningful opportunity to present a complete defense is not in and of itself enough for federal habeas relief under 28 U.S.C. § 2254. State prisoners seeking federal habeas relief are only entitled to relief if the constitutional trial error "'had substantial and injurious effect or influence in determining the jury's verdict.'"

14

*Brecht*, 507 U.S. at 627 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  In other words, federal habeas relief is limited to constitutional error that resulted in "actual prejudice."  *Id.* at 637 (citation omitted).

### 4.    Analysis

In the petition, Petitioner argues that the "centerpost of [his] defense was that he shot two menacing intruders, Glaspie and Daniels, in an explosive and dangerous situation, panicked they would summon fellow gang members to hurt him or other people."  Dkt. 1 at 11.  Petitioner urges that his defense rested on the jury's complete understanding of the impact of his circumstances, arguing:

> [Petitioner's] decades [of] living in a neighborhood plagued by extreme gang violence informed his fear, his perception of threat, and his belief that he had to shoot.  The jury needed to know just how serious, pervasive, and threatening that violence was to understand his assertion that he only shot in imperfect self-defense, and/or heat-of-passion manslaughter.

*Id.*  Petitioner claims that he "offered a superbly[,] qualified and experienced expert" on gang affiliation, Investigator O'Brien, who would have testified as follows:

> The expert would have testified that Glaspie was a senior gang member committed to violence with rival gangs, involved with myriad gang member committed to violence with rival gangs, involved with myriad gang homicides and shootings; and that Daniels was close to him and deeply involved with the gang.  (4 CT 793-794, 798, 795.)  He would have testified that Glaspie and Daniels were known to carry guns and that the community believed Daniels had killed Elijah Hopkins and Glaspie knew about the murder and may have participated in it.  (4 CT 797.)

*Id.* at 11-12.  Petitioner asserts that the evidence was relevant and argues the trial court erred in excluding the evidence as irrelevant because it adopted the prosecutor's reasoning that "imperfect self-defense and heat-of-passion manslaughter applied 'a reasonable person standard,' not that of a reasonable person from a particular neighborhood."  *Id*. at 12-13 (citing July 15, 2015 Augmented Reporter's Transcript ("ART") 5-6).  He also argues that the resulting error was therefore prejudicial and not harmless.  *Id.* at 21-25.

However, in rejecting Petitioner's claim, the state appellate court pointed out that in excluding the aforementioned expert testimony "[t]he [trial] court specifically stated that it was not precluding [Petitioner] from talking about these issues but the expert testimony was not

United States District Court
Northern District of California

probative, it was prejudicial and 'extremely time consuming.'" *Wilkins*, 2018 WL 4091012, at *4.

In response to Petitioner's argument supporting the more subjective "reasonable gang member" standard, the state appellate court noted:

> In *People v. Humphrey* (1996) 13 Cal. 4th 1073 (*Humphrey*), our Supreme Court held that expert evidence on intimate partner violence was admissible under Evidence Code section 1107, but explained that its decision was not "changing the standard from objective to subjective, or replacing the reasonable 'person' standard with a reasonable 'battered woman' standard" for self-defense and that its decision "would not, in another context, compel adoption of a ' "reasonable gang member" standard.' " (*Humphrey*, at p. 1087.)

*Id.* at *5. Furthermore, the state appellate court turned to a recent state court decision, which sought to clarify the reasonable person standard applicable to self-defense by stating as follows:

> To justify an act based on self-defense, a defendant must have subjectively held an objectively reasonable belief that bodily injury was imminent. The objective component considers what would have appeared necessary to a reasonable person in the defendant's situation with his or her knowledge.

*Id.* at *6 (quoting *People v Brady*, 22 Cal. App. 5th 1008, 1017, 1010 (2018)). The state appellate court noted that the "reasonable person standard takes into account a defendant's knowledge that may increase his or her ability to accurately predict impending violence[,]" but "this did not include [the defendant's] personal attributes and experiences" and "[a defendant's] personal history of trauma was not folded into the objective prong of a self-defense claim." *Id.* at *7. Thus, the state appellate court concluded that Petitioner's "personal experience with Glaspie and the Towerside gang was presented to the jury but it [was] not part of the reasonable person standard and does not require expert testimony." *Id.* at *8 (brackets added). Again, the state appellate court stressed that the defense gang-expert testimony Petitioner sought to introduce was "not probative and was prejudicial" and the trial court did not err in excluding it, stating as follows:

> The expert testimony appellant sought to introduce was not probative and was prejudicial. The offer of proof included O'Brien's views of the gang culture in Visitation Valley, the victims' gang affiliation and the city attorney's gang injunction against the Towerside gang. It also included O'Brien's opinions about the victims, much of which was inadmissible hearsay.
>
> After appellant testified, his testimony combined with Augusta and Fells explained the relationship between the Towerside gang and

1
2
3
4

United States District Court
Northern District of California

> individuals present at the Burr Street house. Appellant also explained his experience with the victims and the fact he was threatened when he was younger. The jury had the necessary " ' " 'facts and circumstances' " ' " to determine whether a reasonable person in a similar situation with similar knowledge would feel the need to defend himself. (*Humphrey*, *supra*, 13 Cal. 4th at pp.1082-1083.) We find no error in the court's exclusion of gang expert testimony.

*Id*. Finally, the state appellate court found that "[t]he trial court did not err in finding the proposed expert testimony was more prejudicial than probative because it was not relevant to the issues before the jury. *Id.*

First, habeas relief is not warranted here because the Supreme Court has never addressed whether the exclusion of expert witness testimony violates the Constitution. *See Brown*, 644 F.3d at 983; *Moses*, 555 F.3d at 758-59. In the absence of a Supreme Court case on point, federal habeas relief is not available.

Second, to the extent that Petitioner claims that the trial court's exclusion of the gang-expert testimony violated state procedural law, such a claim does not give rise to a cognizable claim on federal habeas relief. *See Estelle* 502 U.S. at 67.

Third, Respondent points out that the "record does not show that the trial court constitutionally erred by barring the proffered gang-expert testimony." Dkt. 12-1 at 24. This Court agrees that any due process claim related to the denial of gang-expert testimony was reasonably rejected on appeal. *Wilkins*, 2018 WL 4091012, at *7. The state appellate court held that the trial court acted reasonably in determining that the potential probative value of the gang-expert testimony was outweighed by its prejudicial effect and the time such testimony would consume. *Id.* The record shows that the trial court considered Petitioner's arguments at the July 15, 2015 hearing on the defense motion to introduce the gang-expert testimony. *See* ART 3-9. After listening to argument from the parties, the trial court reasonably found the proffered testimony not relevant under California Evidence Code § 210 and more prejudicial than probative under California Evidence Code § 352. *See id.* Specifically, the state appellate court reasonably determined the record supported the trial court's barring the proffered gang-expert testimony, as follows:

> [T]he videotape played for the jury showed appellant shoot Glaspie in the head. Daniels witnessed the shooting and began to run away

17

and appellant shot him in the head from behind.  Appellant then stood over Daniels and shot him twice more in the head.  He then returned to Glaspie and shot him again in the head.  Both victims were not armed.

Prior to the shooting, Daniels was crying and repeatedly saying "I didn't do it."  Janeka Fells testified she never saw Daniels or Glaspie with a weapon or heard them threaten anyone.  Appellant testified Glaspie said: "I'm going to get my Tower niggas," but he never mentioned any threat by Daniels.  Appellant perceived Glaspie's statement as a threat, but even if we accept the statement as true, it was not an imminent threat.  Self-defense "requires without exception that the defendant must have had an actual belief in the need for self-defense. . . .  Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice.  The defendant's fear must be of imminent danger to life or great bodily injury."  (*In re Christian S.* (1994) 7 Cal. 4th 768, 783, italics omitted.)  Appellant failed to demonstrate imminent danger, especially from Daniels.  Glaspie and Daniels were standing on the street, unarmed.  Even if we believe appellant's testimony that he thought Glaspie may have summoned or would summon members of his gang, that was not an immediate threat to appellant's life or body.

The gang expert testimony was supposed to demonstrate Glaspie was a Towerside gang leader, Daniels was associated with Towerside gang members and that their presence at the Burr Street house was a provocative act.  However, all of this was presented to jury through testimony of other witnesses as well as appellant's testimony.

Finally, appellant testified the [sic] he felt scared and wanted to prevent gang violence which caused him to shoot Glaspie and Daniels.  However, shooting two gang members, one of whom appellant believed to be a leader, would only incite more violence and retribution.  Appellant failed to testify to anything that made the gang expert testimony more probative than prejudicial.

The trial court did not err in finding the proposed expert testimony was more prejudicial than probative because it was not relevant to the issues before the jury.

*Wilkins*, 2018 WL 4091012, at *7-8 (brackets added).

Fourth, while Petitioner argues that corroboration of his testimony was an essential component of his defense, such an argument is unavailing.  Dkt. 1 at 20.  Petitioner relies on a Ninth Circuit case, *United States v. James*, to support his argument that "evidence corroborating a defendant's account is critical to a homicide defense."  *Id.* (citing *United States v. James*, 169 F.3d 1210, 1214 (9th Cir. 1999)).  In *James*, the Ninth Circuit found that evidence corroborating defendant's reason to fear the victim was "absolutely necessary to her defense."  *James*, 169 F.3d at 1214.  This corroboration was deemed necessary to ensure that the defendant was not making

18

up wild stories of her partner's violence (including his "stabbing of an old man; stabbing of another person with a pen; and [his] murdering a man."). *Id.* Conversely, here, the record shows that the validity of Petitioner's belief—that Glaspie and Daniels were gang members and that gang violence was prevalent in his neighborhood—was not at issue as it was already corroborated by evidence other than Petitioner's own testimony. For example, other evidence admitted at trial established that Glaspie was a self-admitted Towerside general, and that Daniels associated with Towerside gang members and was Glaspie's "flunkey." 14 RT 1112-1113, 1115-1116. The 911 call established that the caller was fearful because Elijah Hopkins's suspected killer had arrived at 50 Burr Street, and that gunshot ensued after the killer's arrival. 5 CT 948-953. Janeka Fells corroborated that "commotion" and "yelling" followed Daniels' and Glaspie's arrival at the residence. 11 RT 750-753. Erica Augusta testified that she had heard that Daniels was Elijah's killer, and testified that she became scared after Daniels and Glaspie arrived at her residence. 11 RT 790, 793. Eric Sexton testified that he became scared after Daniels and Glaspie showed up. 16 RT 1358. Thus, because the record shows that such proffered evidence was cumulative to the other evidence admitted at trial, the state appellate court reasonably found no error in the trial court's exclusion of the gang-expert testimony. *See Wilkins*, 2018 WL 4091012, at *7.

Fifth, the state appellate court reasonably determined that the trial court instructed the jury on self-defense, heat of passion, provocation, and imperfect self-defense, stating as follows:

> The trial court instructed the jury on self-defense that appellant must reasonably believe he or others present at the Burr Street house were in imminent danger of being killed or suffering great bodily injury or reasonably believe the immediate use of deadly force was necessary. "When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed." The court further instructed the jury they could consider if appellant knew Glaspie and Daniels had threatened or harmed others in the past. The trial court also instructed the jury on heat of passion, provocation, and imperfect self-defense.

*Id.* at *4. Thus, the jury was equipped with the instructions necessary to determine whether Petitioner's testimony (that he was prompted to act out of fear based on his belief that Glaspie and Daniels were gang members, *see* 14 RT 1109) was trustworthy as corroborated by the 911 call (5

CT 948-953), Erica Augusta (11 RT 790, 793), and Eric Sexton (16 RT 1358).  Because, as mentioned above, Petitioner's belief—that Glaspie and Daniels posed a greater risk due to their alleged gang affiliation—had already been corroborated by multiple sources, the state appellate court reasonably determined that the jury would then be able to use such information in their consideration of whether Petitioner "knew Glaspie and Daniels had threatened or harmed others in the past."  *Wilkins*, 2018 WL 4091012, at *7.

Finally, Petitioner has not shown prejudice.  As explained above, a violation of a constitutional right is not in and of itself enough for federal habeas relief.  State prisoners seeking federal habeas relief are only entitled to it if the constitutional trial error resulted in "actual prejudice."  *Brecht*, 507 U.S. at 637.  Petitioner alleges that the state appellate court misunderstood the nature of his defense by arguing that the surveillance video admitted into evidence (showing Petitioner shot both victims multiple times) demonstrated that "he could not have had actual fear justifying self-defense."  Dkt. 1 at 22 (citing *Wilkins*, 2018 WL 4091012, at *7).  In focusing on the second degree murder conviction for killing Daniels, Petitioner argues that he never alleged self-defense, but instead argued consistently that if the gang-expert had testified, the jury could have found that Daniels's shooting was manslaughter through *imperfect* self-defense or heat of passion manslaughter."  *Id.* (italics in original).[6]  Specifically, Petitioner argues as follows:

> Here, the expert's testimony would have shown jurors that [Petitioner] could have believed he needed to shoot to protect himself or others because Daniels could have his gang cohorts there in an instant.  It also would have shown Daniels' intrusion into the grieving family's home, followed by his fistfight with Elijah Hopkins' brother, was so provocative, in light of the full circumstances that the shooting could have been heat-of-passion manslaughter rather than second-degree murder.

*Id.* at 23-24.  Furthermore, Petitioner argues that that the state appellate court's "observation that

---

[6] The jury was instructed pursuant to CALCRIM No. 571 as follows: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense or imperfect defense of another.  [¶]  If you conclude the defendant acted in complete self-defense or defense of another, his action was lawful and you must find him not guilty of any crime.  The difference between complete self-defense or defense of another and imperfect self-defense or imperfect defense of another depends on whether the defendant's belief in the need to use deadly force was reasonable."  5 CT 1013.

'all of this was presented to the jury through testimony of other witnesses as well as appellant's testimony' ignores the power of having an expert corroborate and buttress a witness's testimony." *Id.* at 24 (quoting *Wilkins*, 2018 WL 4091012, at *8). Petitioner asserts that,

> [his] testimony that decades of experience with extreme gang violence caused him to believe he had to shoot Daniels to prevent harm to himself or others was 'not substantially corroborated by evidence giving it independent reliability.' The proffered expert testimony would have provided that corroboration.

*Id.* at 25. However, the state appellate court reasonably found that none of these alleged errors resulted in actual prejudice as indicated by the jury finding Petitioner guilty of the lesser-included offense as to Glaspie's killing, stating: "The fact that the jury convicted appellant of the voluntary manslaughter of Glaspie rather than first degree murder demonstrates the jury understood the court's instructions and properly applied them." *Wilkins*, 2018 WL 4091012, at *9.[7]  Moreover, the evidence supporting the convictions was strong. All gunshots were fired at close range and at unarmed men, refuting the defense theory of self-defense. Immediately, after the shootings, Petitioner fled the scene. About three weeks later, officers attempted to arrest Petitioner and he ran from the officers after discarding a semiautomatic handgun. On this record, given the overwhelming evidence of guilt, any presumed evidentiary error was harmless under *Brecht*. *See* 507 U.S. at 637-638.

In sum, it cannot be said that the state courts' rejection of Petitioner's claim was contrary to, or an unreasonable application of Supreme Court precedent, nor was it objectively unreasonable in light of the totality of the evidence presented. It is therefore entitled to AEDPA deference. Accordingly, Claim 1 is DENIED.

---

[7] The jury was instructed with CALCRIM No. 522, which states as follows:

> Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.

5 CT 1011.

United States District Court
Northern District of California

### B.   Prosecutorial Misconduct

#### 1.   Background

Petitioner claims that the prosecution committed misconduct during rebuttal argument by misstating the standard for heat of passion voluntary manslaughter (specifically as to provocation) which, because left uncorrected by the trial court, violated Petitioner's Fourteenth Amendment right to due process and a fair trial. Dkt. 1 at 27-34. Again, the Court points out that Petitioner only challenges his second degree murder conviction as to the killing of Daniels, just as he did on direct appeal. *See id.* at 34 ("The error requires reversal of the second-degree murder conviction."); *see also Wilkins*, 2018 WL 4091012, at *1. Therefore, Petitioner argues that, absent the prosecution's misleading statement regarding provocation, and the trial court's failure to provide proper clarification, "the jury could have had a reasonable doubt that the prosecution had proved that Daniels'[s] shooting did not fall under [the provocation] doctrine" therefore finding a verdict lesser than second degree murder. Dkt. 1 at 34.

#### 2.   State Court Opinion

The state appellate court summarized offered testimony and trial court proceedings as follows:

> In its rebuttal argument, the prosecution stated:
>
> "Provocation is a small portion of heat of passion. Take a look at what the law actually says. It's not enough that the defendant simply was provoked. Everybody at [the Burr Street house] was provoked. . . . [¶] The defendant is not allowed to set up his own standard of conduct. In deciding whether provocation was sufficient consider whether a person of average disposition in the same situation and knowing the same facts would have acted from passion rather than judgment.
>
> "So everybody there was upset, was angry, was yelling. Lawyers go back and forth about who the average person or who the reasonable person is. But I would submit to you that a good example would be evidence of every other person at [the Burr Street house]. Every other person was in the same situation. They had at least the same relationship to this young man who was killed, if not closer. They knew the same facts. They heard the same rumors. . . .
>
> "This is natural reaction of a reasonable person: I'm upset. I'm angry. I'm sad. I'm confused. I'm going to yell at you. . . . [¶] *You can decide by looking at the reaction of the average reasonable person, of everyone else, what did they not do? Murder two people.*" (Italics added.)

United States District Court
Northern District of California

1

2

Defense counsel objected: it "misstates the law."  The court then instructed the jury: "if counsel states something different from my instructions, you are to follow my instructions."

3

*Wilkins*, 2018 WL 4091012, at *8.

4

The state appellate court rejected the claim as follows:

5

6

7

8

9

10

11

" 'To constitute a violation of the federal Constitution, prosecutorial misconduct must " 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.' "  [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' "  (*People v. Harris* (2005) 37 Cal. 4th 310, 341, quoting *People v. Benavides* (2005) 35 Cal. 4th 69, 108.)  A prosecutor's improper comments violate the federal Constitution if they " ' " 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citations.]"  (*People v. Cunningham* (2001) 25 Cal. 4th 926, 1000.)

12

13

14

15

Heat of passion arises if, " ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' "  (*People v. Beltran* (2013) 56 Cal. 4th 935, 942 (*Beltran*).)

16

17

18

19

20

21

Appellant relies on *People v. Najera* (2006) 138 Cal. App. 4th 212 (*Najera*).  During the closing argument in *Najera*, the prosecutor argued to evaluate heat of passion, the jury must consider whether "a reasonable, ordinary person" would have reacted as the defendant did. (*Id.* at p. 223.)  The prosecutor stated: "Would a reasonable person do what the defendant did?  Would a reasonable person be so aroused as to kill somebody?  That's the standard."  (*Ibid.*, italics omitted.)  In rebuttal, the prosecutor stated: " '[T]he reasonable, prudent person standard . . . [is] based on conduct, what a reasonable person would do in a similar circumstance.  Pull out a knife and stab him?  I hope that's not a reasonable person standard.' " (*Ibid.*)

22

23

24

25

26

27

The *Najera* court held: "The focus is on the provocation—the surrounding circumstances—and whether it was sufficient to cause a reasonable person to act rashly.  How the killer responded to the provocation and the reasonableness of the response is not relevant to sudden quarrel or heat of passion." (*Najera*, supra, 138 Cal. App. 4th at p. 223.)  The prosecutor's remarks were misleading and a misstatement of law, but despite the error, the court concluded that no reversal was necessary.  (*Id.* at p. 224.)  The court explained that the remarks did not require a reversal as the victim's conduct that precipitated the attack did not demonstrate adequate provocation as a matter of law.  (*Id.* at p. 226.)

28

Appellant is correct that the prosecutor's one statement in rebuttal in this case shares similarities with the improper argument in *Najera* and

United States District Court
Northern District of California

was not the proper statement of the law under *Beltran*. "The proper focus is placed on the defendant's state of mind, not on his particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply react, without reflection." (*Beltran*, *supra*, 56 Cal. 4th at p. 949, italics omitted.) The prosecutor told the jury that everyone else present did not react by committing murder. This was improper because it focused on appellant's actions rather than on his mental state. The prosecutor's statement that a reasonable person would not have killed Daniels and Glaspie was improper because it suggested that the jury should evaluate whether a reasonable person would have acted the way appellant did.

We conclude, however, this statement was not prejudicial. The prosecutor's other statements about provocation and heat of passion were accurate and to the extent the jury was confused, it was properly instructed by the court. The court instructed the jury that "defendant killed someone because of a sudden quarrel or heat of passion if the defendant was provoked. As a result of the provocation the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment. And the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than judgment." The court further explained that it is not enough that the defendant was provoked. "The defendant is not allowed to set up his own standard of conduct. In deciding whether provocation is sufficient, consider whether a person of average disposition in the same situation and knowing the same facts would have reacted from passion rather than judgment." We presume that the jury followed those instructions. (*People v. Boyette* (2002) 29 Cal. 4th 381, 436.)

The fact that the jury convicted appellant of the voluntary manslaughter of Glaspie rather than first degree murder demonstrates the jury understood the court's instructions and properly applied them.

Furthermore, prior to closing arguments, the court instructed the jury: "Nothing that the attorneys say is evidence. In their opening statements and closing arguments the attorneys discuss the case, but their remarks are not evidence." We presume that the " 'the jury treated the court's instructions as statements of law, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' " (*People v. Seaton* (2001) 26 Cal. 4th 598, 646.)

Appellant argues at length the prosecutor's statement violated his Sixth and Fourteenth Amendment rights and should be reviewed under the Chapman standard. "We find that, even if the prosecutor's argument constituted misconduct, it did not render the trial so fundamentally unfair that it triggered the Chapman standard. Nor is it reasonably probable that a more favorable result would have been reached absent the alleged objectionable argument. Reversal is neither warranted nor appropriate. [Citations.]" (*People v. Fernandez* (2013) 216 Cal. App. 4th 540, 564.)

We conclude that "[t]here was no reasonable possibility the prosecutor's challenged statements affected the jury's [verdict].

United States District Court
Northern District of California

[Citation.]"  (*People v. McDowell* (2012) 54 Cal. 4th 395, 438.)
*Id.* at *8-10.

### 3.    Applicable Federal Law

A defendant's due process rights are violated when a prosecutor's comments render a trial fundamentally unfair.  *See Darden v. Wainwright*, 477 U.S. 168, 170, 181, 183 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) (Prosecutor's remark about defendant's expectations at trial by itself was not a denial of due process.); *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").  However, "the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'"  *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 642).

A petitioner is not entitled to habeas corpus relief in the absence of a due process violation even if the prosecutor's comments were "undesirable" or "erroneous."  *Donnelly*, 416 U.S. at 642.  A prosecutorial misconduct claim based on improper statements is decided "on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (internal quotation marks omitted); *see Trillo v. Biter*, 769 F.3d 995, 1001 (9th Cir. 2014) ("Our aim is not to punish society for the misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial.").

Even if prosecutorial misconduct occurred, habeas relief is not available unless the constitutional error had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  *Brecht*, 507 U.S. at 637-638.

### 4.    Analysis

Petitioner claims that the prosecutor engaged in misconduct by misstating the law on provocation during rebuttal argument.  Dkt. 1 at 27-34.  As explained above, the jury was instructed with CALCRIM No. 522, which states in pertinent part, as follows: "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter.  The weight and significance of the provocation, if any, are for you to decide."  5 CT 1011.  In

United States District Court
Northern District of California

California, heat of passion voluntary manslaughter requires that the provocation be such as would cause an ordinary person "to act rashly and without due deliberation," and not that the provocation be such as would cause an ordinary person to kill.[8]  5 CT 1012.   Petitioner pointed out that the prosecution initially stated the correct standard, but then misstated the law:

> [T]he prosecution argued that the jury could not find sufficient provocation for voluntary manslaughter because the other people in the house "didn't murder two people."  (16 RT 1423.)  It quoted the proper standard, saying: "In deciding whether the provocation was sufficient consider whether a person of average disposition in the same situation and knowing the same facts would have acted from passion rather than judgment."   (16 RT 1422.)  But it did not stay with that correct standard.
>
> Moments later, it improperly argued that the provocation wasn't sufficient for manslaughter because no one but appellant "murdered two people."  It urged: "Everybody at 50 Burr was provoked . . . Everybody was feeling the same emotions . . . everybody there was upset, was angry, was yelling. . . .  Lawyers go back and forth about who the average person or who the reasonable persion [sic] is.  But I would submit to you that a good example would be evidence of every other person at 50 Burr Street. Every other person was in the same situation. . . .  You can decide by looking at the reaction of the average reasonable person, of everyone else, what did they not do? Murder two people."  (16 RT 1422-1423).

Dkt. 1 at 27-28 (brackets added).  Thus, this amounted to prosecutorial misconduct in Petitioner's view.

The state appellate court agreed that the challenged statement in the prosecution's rebuttal was improper, but concluded that it was not prejudicial because "[t]he prosecutor's other statements about provocation and heat of passion were accurate and to the extent the jury was confused, it was properly instructed by the court."  *Wilkins*, 2018 WL 4091012, at *9.

Petitioner challenges the state appellate court's finding by arguing that "the [trial] court never addressed the misstatement, so the jury had no way to know that it could not, in fact,

---

[8] The jury instructions for "Voluntary Manslaughter: Heat of Passion" stated in pertinent part: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. The defendant killed someone because of a sudden quarrel or in the heat of passion if: (1) The defendant was provoked; (2) As a result of the provocation the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; AND (3) The provocation would have caused a person of average disposition to act rashly and without due deliberation that is, from passion rather than from judgment."  5 CT 1012.

consider whether other people at 50 Burr were moved to kill." Dkt. 1 at 29.  Instead, Petitioner points out that the trial court "did not cure the problem" after defense counsel objected, stating as follows: "It did not tell it which instruction to consult; it did not flag the difference between a standard where a reasonable person would have been moved to kill, and a standard where a reasonable person would have been moved to act out of passion, without deliberation." *Id.* at 32. The record shows that that the trial court told the jury that "if counsel states something different from [the court's] instructions, [the jurors] are to follow [its] instructions."[9] 16 RT 1423. Petitioner argues that the trial court's "response did not cure the error, because improper prosecutorial statements cannot be neutralized by instructions that do not in any way address 'the specific statements of the prosecutor.'" Dkt. 1 at 32 (quoting *United States v. Weatherspoon*, 410 F.3d 1142, 1151 (9th Cir. 2005)).

As mentioned above, even if the prosecutor's statement was "undesirable," "erroneous," or, as in this case, left uncured, it would not entitle Petitioner to habeas corpus relief without a finding of a due process violation. *Donnelly*, 416 U.S. at 642.  Therefore, the issue is not, as Petitioner presents it, whether the prosecution's misstatement of the law went uncured, but rather whether it had the effect of "infect[ing] the [overall] trial with unfairness." *Johnson*, 63 F.3d at 929. The state appellate court reasonably found that it did not. *See Wilkins*, 2018 WL 4091012, at *9-10. In light of the legally correct jury instruction on heat of passion voluntary manslaughter (including the portion on provocation), the trial court's reminder to jurors that its version of the law controlled, and the overwhelming evidence supporting the convictions (as stated above), the alleged prosecutorial misconduct did not have a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 638.

Additionally, Respondent urges that the prosecution's comment should "at worst" be considered "noncomprehensive" since it "did not purport to restate the entire law contained in the trial court's jury instruction on adequate provocation . . . [and] [i]nstead, the prosecutor argued that others who were present were not provoked to kill." Dkt. 12-1 at 29.  Respondent also points

---

[9] The trial court's reference to its instructions controlling is sufficient given that the jurors were given the instructions for review during their deliberations.

1   out that "the trial court admonished the jury with a reiteration of CALCRIM No. 200 that they

2   were to follow the law as instructed by the trial court." *Id.* (citing 16 RT 1423; 5 CT 978).  In

3   determining whether a due process violation occurred, "it is appropriate to consider whether the

4   jury was instructed to decide solely on the basis of the evidence rather than counsel's arguments,

5   and whether the state's case was strong." *Furman v. Wood*, 190 F.3d 1002, 1006 (9th Cir. 1999)

6   (citing *Darden*, 477 U.S. at 182).  The Supreme Court has recognized similar limiting instructions

7   to be presumed effective.  *Donnelly*, 416 U.S. at 645 (no constitutional violation where

8   prosecutor's statement "was but one moment in an extended trial and was followed by specific

9   disapproving instructions"); *see also Brown v. Payton*, 544 U.S. 133, 146-147 (2005) (even where

10  prosecutor erroneously argued that jury could not consider defense evidence and trial court did not

11  give immediate curative instruction or expressly inform jury it could consider evidence, "[t]he jury

12  was not left without any judicial direction" as it was advised in closing instructions to consider

13  "all evidence").  This Court must therefore presume that the jury carefully examined the trial

14  court's instruction on heat of passion voluntary manslaughter (CALCRIM No. 570) and that the

15  jury determined the adequacy of the provocation by considering whether a person of average

16  disposition would have been induced to react from passion, rather than from judgment.  Therefore,

17  it was reasonable for the state appellate court to conclude that reversal of the second degree

18  murder conviction for the killing of Daniels was unwarranted because the prosecutor's

19  misstatement did not so infect the trial with unfairness to amount to a due process violation.  *See*

20  *Wilkins*, 2018 WL 4091012, at *10.

21      Accordingly, Petitioner is not entitled to the writ on this claim, and Claim 2 is DENIED.

22      **C.      Cumulative Error**

23      Petitioner argues that the cumulative effect of the errors violated his right to a fair trial.

24  The state appellate court determined that the cumulative effect of any trial errors did not violate

25  due process, stating: "We have rejected appellant's arguments that errors occurred during his trial.

26  Accordingly, we reject his contention that the cumulative effect of the errors requires reversal."

27  *Wilkins*, 2018 WL 4091012, at *10.

28      In some cases, although no single trial error is sufficiently prejudicial to warrant reversal,

United States District Court
Northern District of California

the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned.  *Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003).  However, where there is no single constitutional error existing, as in this case, nothing can accumulate to the level of a constitutional violation.  *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011).  Accordingly, the Court finds that the state appellate court was reasonable in its rejecting Petitioner's claim for cumulative error, and he is not entitled to relief.  Therefore, Claim 3 is DENIED.

## V.      CERTIFICATE OF APPEALABILITY

No certificate of appealability is warranted in this case.  For the reasons herein, jurists of reason would not find this Court's denial of Petitioner's claims debatable or wrong.  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

## VI.     CONCLUSION

For the reasons outlines above, the Court orders as follows:

1.      All claims from the petition are DENIED, and a certificate of appealability will not issue.  Petitioner may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

2.      The Clerk of the Court shall terminate any pending motions and close the file.

IT IS SO ORDERED.

Dated: March 12, 2021

_____
JUDGE YVONNE GONZALEZ ROGERS
United States District Judge